(631 P.2d 1245)

No. 51,858

In the Interest of ANTHONY VINCENT ZAPPA and DEANA ZAPPA, Minors

Opinion filed August 7, 1981.

*James Forrest McMahon,* of Kansas City, for the appellant.

*James F. Foster,* assistant district attorney, *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, for the appellee.

Before FOTH, C.J., PARKS and SWINEHART, JJ.

SWINEHART, J.: This is an appeal by the natural mother from a finding of unfitness and severance of her parental rights.

Tony and Deana Zappa were born March 25, 1968, and April 13, 1969, respectively, in Wood River, Illinois, to Beverly and Anthony V. Zappa, Sr. In late 1972, Tony was diagnosed by the St. Louis Children's Hospital as hyperkinetic and two years slow in development. In March, 1973, Beverly and the two children

moved to Kansas City where Beverly had relatives, in order that Tony could be treated as an outpatient at the Kansas University Medical Center (KUMC). Beverly divorced Anthony V. Zappa, Sr., in 1974.

In 1975 Beverly met Carl Ray Chase who moved in with her and introduced her to drug usage. After hospitalization for an overdose on May 28, 1977, Beverly allegedly took the "cold cure" and quit using drugs. On January 13, 1978, Beverly shot and killed Carl Chase while he was in bed with her 18-year-old daughter from a previous marriage.

While in jail awaiting trial, Beverly requested foster home care for Tony and Deana. On February 2, 1978, a dependent and neglected petition was filed alleging the children were without proper care, custody or support. Both children were placed in foster homes. Beverly waived the detention hearing, then gained a continuance of the dependent and neglected hearing until after her criminal proceedings were completed. Beverly pled guilty to voluntary manslaughter on September 5, 1978, and was sentenced to the Kansas Women's Correctional Institution. On September 29, 1978, the dependent and neglected hearing was held. The petition was orally amended to conform with the 1978 amendment to K.S.A. 38-802(g)(1):

"(g) 'Deprived child' means a child less than eighteen (18) years of age:

"(1) Who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for such child's physical, mental or emotional health, and the deprivation is not due solely to the lack of financial means of such child's parents, guardian or other custodian; . . ."

Beverly stipulated to the deprived finding and it was also sustained with regard to Anthony V. Zappa, Sr. The court awarded legal and physical custody of the children to SRS, allowed the maternal grandparents visitation and stated Beverly Zappa could petition for the return of custody upon her release from prison.

Tony's emotional and behavioral problems made him too disruptive to remain in a regular foster home and on September 6, 1978, he was transferred to the KUMC children's psychiatric ward. On March 5, 1979, he was moved to the Rainbow Unit of the Osawatomie State Hospital for long-term therapy. On June 4, 1979, Tony was molested by an employee of the Rainbow Unit who pled guilty to indecent liberties with a ward, K.S.A. 21-3504, on August 21, 1979. A suit was filed on Tony's behalf against the State for damages.

SRS filed an amended petition on July 26, 1979, asking for severance of the Zappas' parental rights and alleging that Tony and Deana were deprived children, pursuant to K.S.A. 1980 Supp. 38-802(g).

"(1) Who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for such child's physical, mental or emotional health, and the deprivation is not due solely to the lack of financial means of such child's parents, guardian or other custodian;

. . . .

"(3) who has been abandoned or physically, mentally, emotionally abused or neglected or sexually abused by his or her parent, guardian or other custodian; or  . . . ."

Beverly was released from prison in August, 1979, and residential service was made on September 8, 1979. Interrogatories were mailed by appellant on September 19, 1979, and received by the State late September 25, 1979. At the first hearing on September 27, 1979, appellant moved for a continuance to permit the State time to answer the interrogatories and to permit her to prepare a defense. The motion was denied and testimony from the State's witnesses was received on September 27 and 28. The hearing was continued until November 1 to permit evaluation of the children by a psychiatrist selected by the appellant and additional testimony by the State's witnesses.

On October 24, 1979, the court denied a motion to compel discovery filed when the staff psychologist at the Rainbow Unit refused during her deposition to answer questions related to Tony's molestation. The psychologist subsequently testified on November 1 about Tony's treatment other than the molesting incident.

Appellant testified on her own behalf on November 1, and the hearing was continued until November 7 to allow testimony of her psychiatric expert.

The court issued a letter decision December 6, 1979, finding the children were deprived and that both parents were unfit. Their parental rights were ordered severed.

The natural mother raises seven issues on appeal: (1) Whether the use of form petitions violated the notice requirements of the due process clause of the Fourteenth Amendment; (2) whether it was abuse of judicial discretion and denial of due process for the court to deny appellant's request for a continuance at the com-

mencement of the severance hearing; (3) whether it was abuse of judicial discretion, denial of due process and denial of equal protection for the court to deny appellant's motion to compel discovery; (4) whether the court allowed testimony in violation of the physician-patient or psychologist-client privilege; (5) whether the court admitted medical records in violation of the hearsay rule; (6) whether there was sufficient competent evidence to support a severance of appellant's parental rights; and (7) whether the trial court erred in not implementing a less restrictive alternative than severance of parental rights.

Appellant has raised the issue of the use of form petitions violating the notice requirements of the due process clause of the Fourteenth Amendment to the United States Constitution on appeal. Since proceedings under the juvenile code are separate from either civil or criminal proceedings and decisions address-ing the procedural aspects of the juvenile code have created a set of hybrid standards, the issue raised by appellant would be interesting to consider. However, appellant failed to raise the issue during the severance hearings and we cannot consider it. The court in *Malone v. University of Kansas Medical Center,* 220 Kan. 371, Syl. ¶ 1, 552 P.2d 885 (1976), stated:

"Where constitutional grounds for reversal of a judgment are asserted for the first time on appeal they are not properly before the appellate court for review."

Appellant filed a motion for continuance the day before the first hearing alleging that the delay would not endanger the children who were already in SRS custody, that there was a conflict of interest with SRS bringing the severance petition and defending the molesting lawsuit, and that appellant was being deprived of the opportunity for discovery. The court denied the motion at the hearing, ruling:

"THE COURT: At this time the Court is going to deny your motion for continuance. The motion was filed one day prior to the setting, everyone had notice of this setting, the Court finds that the conflict of interest alleged by the attorneys for the mother can be cured by the Court appointing a guardian ad litem and next friend for the child. The child itself after it reaches majority can sue on its own behalf within one year after it reaches majority, that the only issue before this Court at this time is the best interest of the child and whether after the Court hears the evidence that the children are found to be—or the Court has already found the children to be deprived—the issue would be whether the rights of the natural parents should be severed and the Court also holds that the best interests of the children would not be served by continuance and that a more stable

circumstance should be provided for them as soon as possible. So, the Court at this time denies the motion for a continuance."

K.S.A. 1980 Supp. 38-817(*a*) allows for a continuance for "good and sufficient cause" at the discretion of the court. The court in this severance hearing did provide reasons for denying the motion on each ground urged by the appellant. Although nineteen days between the date of service and the date of hearing may not have been much time to prepare a defense, that should have been immediately apparent and the motion could have been made earlier. The State's files were open to appellant and she knew several witnesses would be appearing for whom a last minute continuance would be extremely inconvenient. A continuance of a month or two would not have altered the basis of any alleged conflict since the other case was likely to involve lengthy litigation.

The propriety of denying the continuance to allow discovery will be discussed under the next issue. The State had already made its files available to appellant and the court should not be faulted if appellant did not utilize the opportunity. The denial of the continuance was not an abuse of discretion under the standards set forth in *Stayton v. Stayton,* 211 Kan. 560, 506 P.2d 1172 (1973), and the facts of this case.

"Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. All judicial discretion may thus be considered as exercisable only within the bounds of reason and justice in the broader sense, and only to be abused when it plainly overpasses those bounds." 211 Kan. at 562.

The second discovery clash occurred when appellant sought to depose Diane Lund, the Rainbow Unit staff psychologist, on October 15, 1979. Lund refused to answer questions other than her name, place of employment and qualifications, on the advice of the SRS attorney. She then invoked K.S.A. 59-2931, which prohibits the release of any records of a mental facility patient. K.S.A. 59-2931(*a*)(2)(A) provides that a written consent by the patient, the patient's parent or a guardian may allow release of the records unless the treatment facility finds the release harmful to the patient. After the statements at the deposition, appellant filed a motion to compel discovery which was heard on October 24,

1979. The court ruled that although appellant could pursue discovery relating to the fitness of appellant as a parent, questions involving the molesting incident were irrelevant and immaterial.

Here any possible abuse of discretion by the trial court was without question corrected by its course of conduct during the trial, and the natural mother was ultimately not prejudiced by the court's failure to grant a continuance to permit discovery. The hearing commenced September 27, 1979, and after several continuances and three additional hearings, concluded on November 7, 1979. The trial transcript indicates the appellant was granted many opportunities to review and consider exhibits during the course of the trial. The several continuances granted after the State's evidence was presented gave appellant an opportunity to call all her witnesses, and further, to recall those State witnesses who had previously testified. Appellant has failed to show prejudice resulted from either the original denial of a continuance or from the incomplete discovery process.

Appellant objected to the admission of records and testimony of almost all of the State's witnesses on the basis of the physician-patient, K.S.A. 60-427, and the psychologist-client, K.S.A. 74-5323, privilege. The court overruled each objection stating it was in the "best interests of the child."

In a deprived child-parental severance proceeding under K.S.A. 1980 Supp. 38-818 *et seq.,* the privilege issue raised by appellant must be considered in light of two exceptions to the physician-patient privilege. K.S.A. 60-427 (*d*) and (*e*) state:

"(*d*) There is no privilege under this section in an action in which the condition of the patient is an element or factor of the claim or defense of the patient or of any party claiming through or under the patient or claiming as a beneficiary of the patient through a contract to which the patient is or was a party.

"(*e*) There is no privilege under this section as to information which the physician or the patient is required to report to a public official or as to information required to be recorded in a public office, unless the statute requiring the report or record specifically provides that the information shall not be disclosed."

In a severance action, the physical, emotional and mental conditions of the child and the parent are in issue. In reference to exception (*e*), among the information required to be reported to officials is that of child abuse under K.S.A. 38-716 *et seq.* K.S.A. 38-719 states:

"In any proceeding resulting from a report made pursuant to this act or in any proceeding where such a report or any contents thereof are sought to be intro-

duced in evidence, such report or contents or any other fact or facts related thereto or to the condition of the child who is the subject of the report shall not be excluded on the ground that the matter is or may be the subject of a physician-patient privilege or similar privilege or rule against disclosure."

This statute waives the physician-patient privilege and is construed to waive the psychologist-client privilege.

The connection between the child protection act and the juvenile code has been previously noted in the decisions of *Nunn v. Morrison,* 227 Kan. 730, 608 P.2d 1359 (1980), and *In re Boehm,* 226 Kan. 247, 596 P.2d 1242 (1979). Deprivation and severance actions often begin as reports in compliance with the child protection act. These reports remain strictly confidential until an action is commenced on behalf of the child. The court in *Nunn* balanced the need for the anonymity of those reporting possible abuse with the right of those accused of the abuse to defend the charge once formal proceedings begin. The protection and well-being of the child remains paramount within either act.

The court did not err in overruling appellant's objections on the basis of the psychologist-client privilege and physician-patient privilege. Beverly was not the patient, the guardian ad litem had the power to assert or waive the privilege, and the child protection act effectively waived the privilege.

Appellant also objected to the admission of the medical records as hearsay. However, appellant failed to include the offensive exhibits in the record on appeal and for that reason they will not be considered. The court in *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 3, 564 P.2d 508 (1977), stated:

"It is incumbent upon the appellant to include in the record on appeal any matter upon which he intends to base a claim of error."

Appellant argues the evidence presented was insufficient to support a finding of unfitness. The court in *In re Brooks,* 228 Kan. 541, 546-547, 618 P.2d 814 (1980), summarized the judicial constructions of the term "unfit":

"1. *In re Vallimont,* 182 Kan. 334, 340, 321 P.2d 190 (1958):

" 'Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects.'

"2. *Finney v. Finney,* 201 Kan. 263, Syl. ¶ 2, 440 P.2d 608 (1968), had this to say:

" 'The word "unfit" means, in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody.'

"3. *In re Penn,* 2 Kan. App. 2d 623, 625, 585 P.2d 1072 (1978), held:

" 'The word "unfit" means in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. *In re Armentrout,* 207 Kan. 366, Syl. ¶ 3, 485 P.2d 183 (1971). So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from any other defects. *In re Vallimont,* 182 Kan. at 340.

" 'Inherent mental and emotional incapacity to perform parental obligations can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child. See K.S.A. 1977 Supp. 38-824(c); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974); *In re Bachelor,* 211 Kan. [879] at 883 [508 P.2d 862 (1973)].' "

The testimony of the various State witnesses indicated that Beverly Zappa was primarily responsible for the aberrant behavior of her children. Unrealistic expectations of behavior and development, inappropriate disciplinary methods and a repeatedly critical attitude towards the children prevented the establishment of healthy mother-child relationships. Her unpredictable behavior left the children confused and fearful. When "good" behavior by the children went unrewarded or was punished anyway, the children resorted to "bad" behavior.

Appellant argues the bulk of the evidence presented was too old to be persuasive. Dr. Leona Therou's contacts with Tony and Beverly began in 1973 and continued through 1978. The most extensive studies of Tony were first done in 1973 by Dr. Therou, then in 1978 by the staff at KUMC when Tony was admitted as a patient. Tony's treatment continued through the time of the severance hearing, so that information given by Diane Lund, staff psychologist at the Rainbow Unit, provided an update. Tony's problems were of a long-term origin and the testimony regarding early evaluations were appropriate. Deana was first evaluated in 1976, but her progress was also traced from 1978 through the time of the hearing. Beverly was tested with Deana in 1976 and was again tested on May 29, 1979. Dr. Fowler C. Jones interpreted the first results and Dr. Steven I. Holley evaluated the second test,

indicating a strong correlation between the results of the two tests given some three years apart. The evidence seemed to indicate the emotional problems of Beverly which apparently caused the children's problems still remained.

Appellant's expert, Dr. Claude Werth, essentially considered the testing conducted on Beverly and the children to be worthless. He claimed to be able to evaluate an individual's emotional, mental and behavioral problems in the first twenty minutes of contact with the individual. He considered Tony's problems unrelated to any maternal emotional deprivation, and thought that Deana was a "pleasant, vivacious young girl of at least normal intelligence, very enthusiastic, very spontaneous." His evaluations were made on October 25, 1979, during visits of an hour to two hours in duration. His opinions substantially contradict those of the nine psychiatrists, psychologists and social workers who saw the children over a span of six years. There was substantial competent evidence to support the finding of unfitness.

Appellant's last issue is that a less restrictive alternative should have been tried instead of severance. The court, in *Brooks,* stated:

"The court should carefully consider any particular alternative remedy proposed by an interested party in the case, and if rejected the court should state its reasons for such rejection. The drastic remedy of termination of parental rights should not be utilized unless the court is satisfied there is no realistic alternative and so finds." 228 Kan. at 551.

The findings of the trial court regarding severance clearly indicate a belief on the part of the court that any contact by Beverly with her children would continue to be detrimental. Her deep-seated problems were unresolved and not likely to be corrected, even with lengthy therapy. A less restrictive alternative allowing visitation prior to her incarceration had been tried and was a failure. There seemed to be no reason to forego severance.

Affirmed.